In re PANGBORN.

(District Court, W. D. Michigan, S. D.   May 7, 1910.)

**1.** BANKRUPTCY (§ 81*)—PETITION—CLAIMS.

Where an involuntary petition showed on its face a sufficient petitioning creditor, and there was established on the trial a sufficient petitioning creditor, the absence of a statement in the petition that his debt amounted to more than $500 might be disregarded.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 81.*]

**2.** BANKRUPTCY (§ 76*)—INVOLUNTARY PETITION—CLAIMS.

Where a note evidencing a firm debt on being surrendered to one of the partners in exchange for his personal note was transferred to such partner's wife as a mere subterfuge to avoid any set-off or counterclaim or defense which the other partner might have against the paying partner for contribution, such transfer was not effective to give the wife a standing as a creditor of such nonpaying partner in order to entitle her to petition for bankruptcy adjudication against him.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 76.*]

**3.** LIMITATION OF ACTIONS (§ 49*)—CONTRIBUTION—ACCRUAL OF RIGHT OF ACTION—OPERATION OF STATUTE.

Where the administrator of a deceased partner paid certain indebtedness of the firm, limitations do not begin to run against his right to contribution until payment.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 271; Dec. Dig. § 49;* Contribution, Cent. Dig. § 17.]

**4.** PARTNERSHIP (§ 302*)—PAYMENT OF PARTNERSHIP DEBT—CONTRIBUTION.

Where a bank to which a firm was indebted had presented its claim to the probate court as against the estate of a deceased partner, and the administrator thereupon gave a mortgage on his decedent's real estate to raise money to pay such claim and others, which mortgage and payment were duly reported to the court, such payment could not be regarded as voluntary as against the administrator's right to contribution.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 302.*]

**5.** PARTNERSHIP (§ 302*)—PARTNERSHIP DEBT—PAYMENT BY ADMINISTRATOR OF DECEASED PARTNER—AUTHORITY.

Where the administrator of a deceased partner paid a debt of the firm, his legal authority to do so could not be raised by the remaining partner in a suit for contribution.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 302.*]

**6.** FRAUDULENT CONVEYANCES (§ 79*)—MORTGAGES—INTENT TO DEFRAUD.

An involuntary bankrupt, having killed his wife in June, 1909, while awaiting trial, contracted with an attorney to undertake his defense and a general adjustment of his affairs for $1,000, whether the services might be more or less, and executed a note for that sum dated September 25, 1909, due in two years, with interest secured by mortgage on real estate. The attorney performed some services in adjusting the alleged bankrupt's affairs, and later induced him to withdraw his plea of not guilty and plead guilty to murder in the second degree, on which he was committed

to prison. *Held.* that such mortgage was not fraudulent as to creditors, though as the matter finally took shape the compensation was large.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 205; Dec. Dig. § 79.*]

7. BANKRUPTCY (§ 91*)—ACTS OF BANKRUPTCY—PREFERENCES—INTENT TO PREFER—EVIDENCE.

Evidence *held* to require a finding that a mortgage executed by an alleged bankrupt while insolvent to an attorney to secure a fee for defending the bankrupt against a prosecution for the murder of his wife was intended to prefer the attorney over the holder of a claim for contribution arising out of transactions of a partnership of which the bankrupt had been a member, and thereby constituted an act of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 91.*]

8. BANKRUPTCY (§ 84*)—INVOLUNTARY PETITION—AMENDMENT—INSOLVENCY—TIME.

Where an involuntary bankruptcy petition alleged insolvency at the date of the filing of the petition, while the schedules filed therewith showed the existence of all the indebtedness, excepting a note given to an attorney for services for several years, and also showed an assertion of the attorney's debt on the date the petition was filed, and contained a statement of assets running back from that period, the court was authorized to permit an amendment of the petition alleging bankruptcy on the date of the execution of the mortgage securing the attorney's claim which constituted a preference.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 84.*]

In the matter of bankruptcy proceedings of Stephen S. Pangborn. On application for adjudication. Order for amendment of petition granted and order for adjudication on the petition is amended.

Walter C. Jones, for petitioners.
Carr & Eby, for alleged bankrupt.

DENISON, District Judge. The petition was filed by two creditors, Eva L. James, who claimed a debt of $700, and J. W. Rose, administrator of Frank Savage, who did not specify the amount of his claim. The petitioning creditors filed simultaneously what purported to be schedules showing a complete list of creditors, and naming only four, including petitioner. By subsequent order they were allowed to, and did, amend their petition so as explicitly to allege that the number of creditors was less than 12.

[1] No objection was taken to the petition because it did not state the amount of the Savage claim; and, although I conclude that the petition must eventually rest on the Savage claim, yet, as it showed on its face a sufficient petitioning creditor, and as there was established upon the trial a sufficient petitioning creditor, the absence of this statement of amount in the petition may be disregarded.

[2] The note held by petitioner, Eva L. James, was given by Pangborn and the petitioner's husband, Lot B. James, to Mr. Lyle, an attorney, for borrowed money. Pangborn and Lot B. James were then partners in an enterprise carried on for some time afterwards. Pangborn testifies, and it is not disputed, that this note was a partnership obligation, and the money was used for partnership purposes.

It appears clearly enough that Lot B. James, and not Eva L. James, is the owner of this note. Mr. Lyle demanded payment from Lot B. James, and thereafter sold it to Eva L. James, in exchange for Lot B. James' new personal note. It is true this new note was also signed by Mrs. James, but I am satisfied the transfer to her was a matter of mere form, adopted as a subterfuge to prevent the setting up of any set-off or counterclaim or defense which Pangborn might have against Lot B. James. · Such a transfer cannot have that effect.

Pangborn testifies that Lot B. James' indebtedness, either to the partnership or Pangborn, was nearly $500, and this is corroborated to some extent, and is not denied. Whether this indebtedness was to the partnership or to Pangborn personally is not clear. In the former event there would be no obligation against Pangborn. In the latter event there might be a small obligation for contribution, but, if it exists, it should be asserted in the name of the real owner. It must be held that the claim asserted by Eva L. James does not exist in her favor.

As to the Savage claim, it appears that Pangborn and Savage were at the time of Mr. Savage's death partners, and were indebted to the bank on a series of notes. The bank also held, or was allowed to have, the proceeds of certain shipments of wool. These proceeds were later applied upon the notes, and left a considerable amount unpaid. Savage was a man of pecuniary responsibility, and a memorandum in the files of the probate court in the handwriting of the probate judge shows that these notes were presented as a contingent claim against the Savage estate, although there was no signed order of allowance. Some four years later, but before any of the notes were barred by the statute, the administrator paid to the bank about $1,700, being the unpaid balance on these notes. It does not appear that there was any other outstanding Pangborn and Savage partnership liability or partnership asset. The present proceeding is therefore for one-half of the amount so paid to the bank.

[3] The statute of limitations is pleaded as a defense, and, if the claim was prosecuted by the bank upon the original notes, it would be a good defense, because nine or ten years have expired since the notes were due; but the cause of action in favor of Rose, administrator, against Pangborn, came into existence when Rose paid to the bank for Pangborn's benefit one-half of the amount; and since that time the statute has not run. I do not understand that the cases holding that one joint obligor cannot by his payment or admission keep the obligation alive as to the other obligor have any application to this situation. This claim is not presented upon the notes nor upon the bank's cause of action assigned to the administrator. It is founded, rather, on the payment by the administrator, then giving rise for the first time to a claim for contribution.

[4] It is further urged that this payment by the administrator was voluntary and unauthorized. I do not think this defense is made out on the facts, because the bank had presented the claim to the probate court, although no formal allowance had been made, and because the files indicate that the administrator gave a mortgage upon the Savage real estate to raise money to pay this and other claims, and such mort-

gage and payment were duly reported to the court. [5] Further, whatever conclusion might be reached as to the administrator's authority to pay this claim, if the payment was questioned by the probate court or by one of the heirs, I do not think such question of technical, legal authority can be raised by a joint obligor in a suit for contribution. If it appears that the claim was a valid one against the estate, and had not been paid, and that the administrator might have been compelled to pay, and did pay, that is a sufficient basis for a claim of contribution.

I conclude, therefore, that Pangborn did owe to one of the petitioning creditors a claim of more than $500.

[6] The original petition in this matter was filed January 24, 1910. On September 25, 1909, Pangborn executed and delivered to Mr. Eby, an attorney, a mortgage upon Pangborn's real estate in Cassopolis, and this mortgage was on the same day recorded. It purported to secure the payment of a note for $1,000, dated September 25, 1909, due in two years, with interest at 6 per cent. The giving of this mortgage is the alleged act of bankruptcy, the petition stating that it was given with intent to hinder, delay, and defraud Pangborn's creditors, and with intent to prefer Mr. Eby, as one creditor, over his other creditors. Two distinct theories of bankruptcy are thus presented.

I am not able to find the existence of any intent to hinder, delay, or defraud creditors. It appears that in June, 1909, Pangborn had killed his wife, and was in jail facing possible punishment for murder in the first degree. He then entered into an agreement with Mr. Eby that the latter would undertake the conduct of Pangborn's defense, and the general adjustment and settlement of all Pangborn's business affairs for a fixed fee of $1,000, whether the services might be more or less. Mr. Eby accordingly took charge of and sold off a considerable amount of personal property, adjusted some existing business obligations, made some collections, paid a large number of debts and expenses, and at the time of this hearing had some $285 balance of money in his hands. He later advised, and it was brought about, that Pangborn abandon the partly prepared defense of insanity and plead guilty to murder in the second degree, and this plea was accepted and sentence of imprisonment at Marquette imposed. It does not appear whether the mortgage of September 25th was before or after this course was definitely determined upon, but, in any event, it was given to secure Mr. Eby for the agreed $1,000. As the matter finally took shape, the amount stated was a large compensation, according to standards there prevailing, for the number of days' time actually expended by Mr. Eby; but the responsibility and burden he undertook were very considerable, and it might have turned out to be a bad bargain for him.

The arrangement and the later mortgage undoubtedly contemplated to some extent future services, and might be criticised as creating a trust for the future benefit of the debtor; but under all the circumstances of this case, and in view of the definite bargain for a round sum, I do not think this consideration taints the mortgage with the legal intent to hinder, delay, or defraud.

I am unable, however, to escape the conclusion that this mortgage was an act of bankruptcy, as being a forbidden preference. This conclusion involves two elements: First, the insolvency of Pangborn and the existence of creditors to be prejudiced; and, second, Pangborn's intent to give a preference.

[7] Pangborn's assets consisted of the Cassopolis real estate, estimated to be worth $2,800, and, as the event has shown, personal property worth $200 or $300 in excess of miscellaneous debts and expenses. The recognized debts, including the first mortgage, the claim of the wife's administrator, and the Eby note, just about equal the value of the real estate, if there was no homestead exemption. The surplus personal property would have been substantially equal to the personal property exemption. The James note must be rejected as not entitled to consideration on this subject. This leaves the Savage claims as the determining factor on the question of solvency. As proved in this case, these claims, with interest to September, 1909, would be about $1,000. The record indicates that there were some additional notes in a similar situation, somewhat increasing this amount. These claims must be recognized as debts against Pangborn, for the reasons already stated, and they seem to me to make his insolvency in September, 1909, clear.

Pangborn certainly did not intend by this mortgage to prefer Eby as a creditor over the first mortgagee nor over the wife's administrator, because both of these parties were secured, one by mortgage and one by attachment, upon the same property covered by the Eby mortgage, and such mortgage must be considered as intended to be subject to both these other claims. Pangborn says he had supposed these Pangborn and Savage bank notes were paid years before out of the proceeds of the wool, and did not know of the existence of this claim. The representatives of the Savage estate admit that they had not demanded payment from Pangborn of the amount for which he was liable on contribution, and excuse such lack of demand upon the stated ground that he was notoriously immune against execution. If Pangborn did not know of this debt, he cannot have intended to give a preference to the prejudice of this debt; but it is a very strong presumption of ordinary affairs that a debtor does know whether or not a debt is paid, and I think that presumption is not overcome. It is reasonably probable that Pangborn, after Savage's death, would have known how much was received for the partnership assets which the bank controlled, and would have known that the deficiency existed. The statement that he thought the entire transaction was closed by the division between himself and Mrs. Savage of the small amount of partnership cash on hand cannot be accepted at its full face, as this would imply that the wool, under the control of the bank, should be sold for exactly the amount of the bank's debt, neither more nor less. It might be thought that at the time of giving the Eby mortgage Pangborn had entirely forgotten the Savage debt (whatever effect such forgetting might have); but it appears that on September 23, 1909, the Savage estate took out an attachment for this claim against Pangborn in the Cass county circuit court, and that such attachment was actually filed in the office of the register of deeds against

this same real estate a few hours before the Eby mortgage was filed. That this is a mere coincidence is improbable; and I conclude that the mortgage was given, at least in part, for the purpose of preferring Mr. Eby as a creditor over the Savage claim. It follows that there must be the usual order of adjudication and of reference.

In view of the first mortgage against the real estate, the attachment by the wife's administrator, filed more than four months before the filing of this petition, the obvious thought that the real estate might have been Pangborn's homestead and so the Eby mortgage might be a valid lien against the trustee, the personal property exemption, and the attorney's lien by Mr. Eby upon the proceeds of his work as attorney if the contract lien is vacated (though it is not intended hereby to decide any of the questions which may arise on these subjects), it seems doubtful whether there may be enough of a surplus to go into the trustee's hands to make these proceedings of any great practical value; but whatever extent and force that consideration may have is not for the court.

[8] Before the order of adjudication is entered, the petition should be further amended so as expressly to show that the insolvency existed on September 25, 1909. It now, in terms, alleges insolvency only at the date of filing the petition; but as the schedules filed therewith show the existence of all the indebtedness, excepting the Eby note, for several years, and show the assertion of this Eby debt on September 25, 1909, and also indicate that the statement of assets runs back over that period, I think there is power to amend the petition in this respect.